# In the United States Court of Federal Claims

No. 16-747
(Filed: April 12, 2018)
FOR PUBLICATION

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

|  |  |
|---|---|
| | * Motion for Summary Judgment; RCFC 56; |
| **SARA MAKOWIEC,** | * Government Employees Training Act; |
| | * 5 U.S.C. § 4103; 5 U.S.C. § 4107; |
| Petitioner, | * 5 U.S.C. § 4101(4); 5 U.S.C. § 4108; |
| | * 5 C.F.R. § 410.309; *Aerolineas Argentinas v.* |
| v. | * *United States*, 77 F.3d 1564 (Fed. Cir. 1996); |
| | * *Clapp v. United States*, 127 Ct. Cl. 505 (1954); |
| **THE UNITED STATES,** | * *Am. Tel. & Tel. Co. v. United States*, 177 F.3d |
| | * 1368 (Fed. Cir. 1999); Illegal Exaction; Training; |
| Respondent. | * Continue-in-Service Obligations; Untimeliness; |
| | * ARDEC; Void Ab Initio; Contract; Agreement |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

*Ryan P. Avery*, Mirageas & Avery, Milford, MA, for Plaintiff.

*Alison S. Vicks*, Trial Attorney, *Chad A. Readler*, Acting Assistant Attorney General, *Robert E Kirschman, Jr.*, Director, *Franklin E. White*, Assistant Director, United States Department of Justice, Civil Division, Commercial Litigation Branch, Washington, DC, for Defendant; of counsel, *Leslie A. Beuttell*, Litigation Attorney, Agency Litigation Division, Civilian Personnel Litigation Branch, United States Army Legal Services, Fort Belvoir, VA.

## ORDER AND OPINION

**Damich**, Senior Judge:

On May 18, 2015, Plaintiff filed a complaint in the United States District Court for the District of Massachusetts alleging that Defendant wrongfully required her to repay tuition assistance she received in order to attend graduate school. *See Makowiec v. United States Dep't of Defense*, 2016 WL 1611434 (D. Mass. 2016). On April 21, 2016, the district court transferred the action to the Court of Federal Claims. *Id.*

On June 27, 2016, Plaintiff filed an amended transfer complaint in this Court. She sought monetary damages under an express contract with Defendant and the return of money allegedly illegally exacted by it. She further asked for declaratory and permanent injunctive relief. *See generally* Am. Compl. On October 3, 2016, Defendant moved to dismiss Plaintiff's requests for declaratory and injunctive relief; Senior Judge Firestone granted this motion on October 12, 2016. *See* ECF No. 12.

On May 1, 2017, Chief Judge Braden ordered the Clerk to randomly reassign the case from Senior Judge Firestone; Senior Judge Futey was assigned to the case. A scheduling order was then issued for summary judgment motions. On September 27, 2017, Chief Judge Braden again ordered the Clerk to randomly reassign the case from Senior Judge Futey. On the same day, this Court was assigned to the case. In accordance with this Court's scheduling order, Plaintiff timely filed her motion for summary judgment and, thereafter, Defendant filed its cross-motion for summary judgment.

Most of the parties' summary judgment briefs were aimed at the contractual issue, not illegal exaction. It was not until Defendant's reply brief that it challenged this Court's jurisdiction to hear a case based on a contract theory of recovery, arguing that there was no contract or, in the alternative, the contract is unenforceable because an appointed government employee cannot sue the U.S. for breach of contract related to employment. Defendant also challenged this Court's jurisdiction regarding the illegal exaction claim alleging that Plaintiff failed to identify any statutes or regulations that would allow her to recover money allegedly illegally exacted by the Government. In her surreply, she agreed that an appointed government employee cannot sue the U.S. for breach of contract related to employment but maintained that she identified particular money mandating statutes giving this Court jurisdiction.

On January 30, 2018, this Court issued its Order and Opinion on the summary judgment motions. Therein, it held that despite retaining jurisdiction on contract claims when the United States is a party, it nonetheless found that the arguments based on contract were withdrawn. This left illegal exaction as the only theory of recovery. However, because illegal exaction was only treated cursorily in prior submissions, the Court ordered further briefing on this sole remaining issue.

Both parties timely filed their renewed motions for summary judgment in accordance with the Court's scheduling order. The matter is fully briefed and ripe for decision.

For the reasons stated below, the Court **DENIES** Plaintiff's renewed motion for summary judgment and **GRANTS** Defendant's motion for summary judgment.

I. **Statement of Facts**

The Court's January 30, 2018 Order includes a complete recitation of the facts, but the Court believes that it is worthwhile to review here the pertinent facts relevant to the illegal exaction issue:

1. Plaintiff began taking her Master's classes at Rensselear Polytechnic Institute ("RPI") on January 23, 2012, the first day of the spring 2012 semester.[1]

---

[1] The class Plaintiff attended on this date (Math 4500), however, neither counted toward the Master's degree nor was completed by Plaintiff. Def.'s Renewed Mot. at 4.

2. She signed an Employee and Training Agreement ("E&T Agreement") with her government employer, Benet,[2] on January 24, 2012.

3. In relevant part, the E&T Agreement provided: "If the intern accepts funding assistance for educational expenses, a service obligation is created. The obligation to the intern is that they agree to remain with the Department of Defense (preferably RDECOM) for the period of time required by regulations. If the intern breaks the service agreement, the Government will recover any un-liquidated obligations by taking any legal means allowed by statute and/or regulation." Appx69.

4. ARDEC paid all of Plaintiff's $41,432.70 graduate school tuition.

5. Plaintiff resigned from Benet on September 6, 2013, 22 weeks before her service obligation ended.

6. On demand, she eventually paid the entire cost of her tuition back to the government.

## II. Standard of Review

The Rules of the Court of Federal Claims ("RCFC") provide that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." RCFC 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). A dispute is "genuine" only if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson*, 477 U.S. at 248. A fact is only "material" if it might "affect the outcome of the suit under the governing law." *Id*. "Contract interpretation is a question of law generally amenable to summary judgment," for questions of law do not turn on factual disputes. *Varilease Tech. Group, Inc. v. United States*, 289 F.3d 795, 798 (Fed. Cir. 2002). There are no genuine disputes of material fact and, therefore, this matter is ripe for review.

## III. Discussion

### A. *The Basic Law of Illegal Exaction Claims*

The Tucker Act provides jurisdiction to recover on an illegal exaction claim. To plead illegal exaction, a plaintiff must demonstrate that he or she, "'has paid money over to the Government, directly or in effect, and seeks return of all or part of that sum' that 'was improperly paid, exacted, or taken from the claimant in contravention of the Constitution, a statute, or a regulation.'" *Fireman v. United States*, 44 Fed. Cl. 528, 534 (1999) (quoting

---

[2] Benet is a subordinate organization of the Weapons & Software Engineering Center, which is a subordinate of the United States Development and Engineering Center ("ARDEC"), which is a subordinate of the US Army Research, Development, and Engineering Command ("RDECOM"). Dkt. No. 38 at 2 n.2.

3

*Aerolineas Argentinas v. United States*, 77 F.3d 1564, 1572-73 (Fed. Cir. 1996).  To put it bluntly, "an illegal exaction has occurred when the Government has the citizen's money in its pocket."  *Clapp v. United States*, 127 Ct. Cl. 505, 512 (1954).

### B.  The Government Employees Training Act

The relevant statutes and regulations at the center of this dispute are those promulgated under the Government Employees Training Act ("GETA"), 5 U.S.C. §§ 4100 *et seq*.

Congress enacted GETA "in order to assist in achieving an agency's mission and performance goals by improving employee and organizational performance[.]"  5 U.S.C. § 4103(a).  In doing so, Congress authorized the heads of agencies to select and assign an employee to training and pay or reimburse the costs of academic training so long as the training "contributes significantly to—meeting an identified agency training need; resolving an identified agency staffing problem; or accomplishing goals in the strategic plan of the agency[.]"  5 U.S.C. § 4107(a)(1)(A)-(C).  Further, Congress specifically withheld an agency's ability to pay for academic programs that are "for the sole purpose of providing an employee an opportunity to obtain an academic degree."  5 U.S.C. § 4107(b)(2).

Training for the purposes of the act means:

> the process of providing for and making available to an employee, and placing or enrolling the employee in, a planned, prepared, and coordinated program, course, curriculum, subject, system, or routine of instruction or education, in scientific, professional, technical, mechanical, trade, clerical, fiscal, administrative, or other fields which will improve individual and organizational performance and assist in achieving the agency's mission and performance goals.

5 U.S.C. § 4101(4).  Employees selected for training "shall agree in writing with the Government before assignment to training" to:

> (1) continue in the service of his agency after the end of the training period for a period at least equal to three times the length of the training period unless he is involuntarily separated from the service of his agency.

5 U.S.C. § 4108(a)(1).  The Code of Federal Regulations ("C.F.R.") also provide that "[a]n employee selected for training subject to an agency continued service agreement must sign an agreement to continue in service after training prior to starting the training.  The period of service will equal at least three times the length of the training."  5 C.F.R. § 410.309(b)(2).

### C.  The Parties' Renewed Motions for Summary Judgment

In her renewed motion for summary judgement, Plaintiff explains her illegal exaction claim in more detail.  In the supplemental brief, she argues that this Court possesses jurisdiction to hear her illegal exaction claim, and then explains why her claim should prevail on the merits.

In its response, Defendant does not specifically contest this Court's jurisdiction to hear Plaintiff's illegal exaction claim as it did in its first summary judgment motion. Rather, all of its arguments here relate to the claim failing on the merits. Therefore, the Court exercises its jurisdiction and turns to Plaintiff's argument that her payments to the government were made in contravention of GETA.

Plaintiff's case for illegal exaction is simply put: the requirement that she pay back the tuition is "in contravention of . . . a statute, or a regulation." *Aerolineas Argentinas*, 77 F.3d at 1572-73. Specifically, she argues that the continue-in-service obligation is conditioned on her having signed an agreement *before* she began her training, that is, before she began taking classes for her Master's. Pl.'s Renewed Mot. at 14. Since she signed the E&T Agreement *after* she began the training, imposing a continue-in-service obligation is in violation of 5 U.S.C. § 4108, as well as 5 C.F.R. § 410.309(b)(2) (both quoted above), and Defendant had no right to pursue the money under that authority.

Defendant argues (1) that her training did not begin on the date that she began taking classes and (2) that even if the E&T agreement was signed after training began, this defect did not invalidate the entire agreement.

*1.    When Did Plaintiff's Training Begin?*

Both Plaintiff and Defendant look to the definition of training in 5 U.S.C. § 4101(4) to establish the date of when Plaintiff's training began. The full definition is quoted above, but the Court feels that the operative language is: "the process of providing for and making available to an employee, and placing or enrolling the employee in, a . . . course [or] curriculum." 5 U.S.C. § 4101(4).

It is not disputed that Plaintiff attended her first class on January 23, 2012 and that she signed the E&T Agreement on January 24, 2012. Defendant, however, points out that she dropped the course (Math 4500) on February 27, 2012, which was the subject of the first class that she attended, and that "the agency did not record the cost of that course in the calculation of what [Plaintiff] owed." Def.'s Mot. at 18. Thus, Defendant concludes that "she nevertheless signed [the continue-in-service obligation] before attending any classes that constituted her training." Def.'s Mot. at 18. Given the ambiguity of the definition of training, this argument is plausible.

*2.    The Validity of the E&T Agreement*

Defendant further argues that, even if the E&T Agreement was signed after training began, the entire agreement is not invalid for failure to comply with the statute. It bolsters this argument by recourse to *Am. Tel. & Tel. Co. v. United States* ["AT&T"], 177 F.3d 1368, 1374 (Fed. Cir. 1999) (citing *United States v. Mississippi Valley Generating Co.*, 364 U.S. 520, 563 (1961)), for the proposition that when a statute "does not specifically provide for the invalidation of contracts which are made in violation of [its provisions]," the Court "shall inquire 'whether the sanction of nonenforcement is consistent with and essential to effectuating the public policy embodied in [the statute].'" Defendant also reinforces its non-invalidation argument by citing

5

the maxim that "invalidation of a contract after it has been fully performed is not favored." *AT&T*, 177 F.3d at 1375.

In *AT&T*, the U.S. Navy and AT&T had entered into a fixed-price contract for a major weapon system in contravention of a federal statute prohibiting this kind of contract. AT&T fully performed the contract but sued the U.S. for more money due to "technical problems and unknowns" that arose during performance. *AT&T*, 177 F.3d at 1370. The U.S. Court of Appeals for the Federal Circuit held that the federal statute prohibited the contract but that the contract was not void ab initio. *AT&T*, 177 F.3d at 1374. The court held that "[i]nvalidation of the contract is not a necessary consequence when a statute or regulation has been contravened, but must be considered in light of the statutory or regulatory purpose, with recognition of the strong policy of supporting the integrity of contracts made by and with the United States." *AT&T*, 177 F.3d at 1374.

### 3. *The Role of the E&T Agreement in Illegal Exaction Analysis*

The illegal exaction claim in this case is complicated by the fact that there was an agreement made between Defendant, through ARDEC, and Plaintiff. The seminal case of *Aerolineas Argentinas* was more straightforward: the U.S. Government imposed a duty on airlines (which cost them money) for which there was no statutory authority. In this case, the parties agree that Plaintiff, as a government employee, cannot sue to enforce the E&T Agreement, but this neither indicates that the agreement was not a contract nor does it mean that the agreement is irrelevant to the Court's analysis as to whether an illegal exaction has occurred. *See* Dkt. No. 38 at 4-5. The Court finds it significant that—despite (arguendo) the untimeliness of the signing—the E&T Agreement informed Plaintiff that ARDEC would pay for her education in return for service after the degree was earned, and, by signing it, she agreed to these terms. *See* Appx69. Therefore, the Court's illegal exaction analysis must take the E&T Agreement into consideration. In other words, in the circumstances of this case, Plaintiff must do more than prove that Defendant exacted money from her and that there was a failure on the part of ARDEC to comply with a statute or a regulation, especially when this statute and regulation had to do merely with timeliness in the context of an ambiguous definition of "training." Despite her late discovery that a timeliness statute and regulation had been violated, Plaintiff knew early on ARDEC's expectations in the grant of money for her education.

The existence of the contract (albeit one unenforceable by Plaintiff as a government employee) brings this case within the purview of *AT&T*. Thus, the contract is not automatically void ab initio as being contrary to law. The Court must now inquire about "the statutory or regulatory purpose" of the statute, and in this case, the regulation as well. *AT&T*, 177 F.3d at 1374.

There is nothing to indicate that the statute and regulation pertinent to this case require invalidation of the E&T Agreement due to untimeliness. As stated above, heads of agencies are authorized to reimburse the costs of academic training so long as the training "contributes significantly to—meeting an identified agency training need; resolving an identified agency staffing problem; or accomplishing goals in the strategic plan of the agency[.]" 5 U.S.C. § 4107(a)(1)(A)-(C). Pointedly for this case, Congress specifically withheld an agency's ability to

pay for academic programs that are "for the sole purpose of providing an employee an opportunity to obtain an academic degree." 5 U.S.C. § 4107(b)(2).

Clearly, the statutory or regulatory purpose of providing education in this case is directed at fulfilling the needs of the agency. There is no indication that ARDEC did not have this kind of goal in mind when it agreed to pay for Plaintiff's education. ARDEC indeed paid for the education and entered into the E&T Agreement with Plaintiff that required her to continue on the job for a period of time established by statute; otherwise, Plaintiff would have to reimburse the agency. Plaintiff earned the degree, ARDEC paid for her schooling, and Plaintiff departed ARDEC's employ before the time that she had agreed to. To reimburse Plaintiff now for the cost of her degree would amount to paying for an academic program "for the sole purpose of providing an employee an opportunity to obtain an academic degree" in contravention of 5 U.S.C. § 4107(b)(2).

The Court's examination of the statutory or regulatory purpose leads the Court to the conclusion that the E&T Agreement was not void ab initio despite the alleged violation of the timeliness statute and regulation, as per *AT&T*. Therefore, Plaintiff is bound by the E&T Agreement; that is, it may figure in the Court's illegal exaction analysis. Furthermore, the E&T Agreement was fully performed by ARDEC and by Plaintiff at least until she ceased its ongoing performance by leaving the ARDEC's employ. This fact calls into play the Federal Circuit's maxim in *AT&T*: "[t]he invalidation of a contract after it has been fully performed is not favored." *AT&T*, 177 F.3d at 1375.

In sum, regardless of the fact that the E&T Agreement was signed in an untimely manner in contravention of a statute/regulation, the agreement was not void ab initio. Plaintiff knew that she had agreed to get the degree, that ARDEC would pay for it, and that she would have to continue to work for ARDEC for a certain period of time. Given this obligation, the Court cannot see how the requirement that Plaintiff reimburse ARDEC when she left its employ prematurely is an illegal exaction. To find an illegal exaction on the basis of a one-day violation of the timeliness statute and regulation in the context of an ambiguous definition of "training" would be to exalt form over substance. Indeed, if Plaintiff had not been compelled to reimburse ARDEC for the cost of her academic training, ARDEC would have been in violation of 5 U.S.C. § 4107(b)(2).[3]

    4.    *The Timeliness of the E&T Agreement*

Finally, there is the question of when the training actually began. The Court is inclined to agree with Defendant that the training did not begin until after the agreement had been signed.

---

[3] Additionally, Plaintiff contends that because she remained employed with ARDEC throughout her graduate schooling, she could not possibly have been in training for the "sole purpose of obtaining an academic degree." Pl.'s Renewed Mot. at 20. However, maintaining her employment is not a condition of the payment; the term of service afterwards is that. The underlying regulations contemplate that the employee must agree to serve three times the length of the training after the end of training. Even though ARDEC received something in exchange for the financial assistance, it did not receive all that the law required.

Therefore, the E&T Agreement was not untimely and in contravention of a statute or regulation. The course that Plaintiff took the day before signing the agreement was not part of her degree program; that is, it was not part of her academic training.  Def.'s Mot. at 18.  She dropped it, and ARDEC did not require reimbursement for this course—and Plaintiff did not pay ARDEC for it. But even if the E&T Agreement was not signed in a timely manner and thus violated a statute and a regulation, the Court holds that requiring Plaintiff to reimburse Defendant for her academic training under these circumstances was not an illegal exaction, as explained above.

**IV.   Conclusion**

For the reasons above, the Court holds that Defendant has not illegally exacted Plaintiff's money, either because the E&T Agreement was signed in a timely matter and thus did not contravene a statute or regulation, or, even if the agreement contravened a statute or regulation, its validity negates the claim of illegal exaction.

Therefore, the Court **GRANTS** Defendant's motion for summary judgment and **DENIES** Plaintiff's renewed motion for summary judgment.

The Clerk is directed to enter judgment accordingly.

**IT IS SO ORDERED.**

s/ Edward J. Damich
EDWARD J. DAMICH
Senior Judge
